The next case on the call are docket numbers 122793, 122822, Carmichael, et al. v. Laborers' & Retirement Board, and others, agenda number 14. Counsel, are you ready? You may proceed. There has been an agreement on time limits. The clerk will give you a three-minute warning. Thank you, Your Honor. May it please the Court, Counsel, I'm Assistant Attorney General Richard Huzzack, Counsel for the State. As an interventor in this case, and in my opening argument on the State's appeal, I will address just the one argument in that appeal, which concerns the provision of Public Act 97-651 that eliminated for members of these three pension systems who had not yet begun a leave of absence when that act took effect, the right to commence a future leave of absence to work for a private labor union and earn service credit in the public pension system for that union employment. This was something that came about in the light of media reports about unexpected uses of this leave of absence provision in a way that surprised and even shocked much of the public. But the issue in this case, which is one of first impression, goes to the heart of whether private employment is something that was intended to be included within the protection of the Pension Protection Clause. The Circuit Court said that it is as long as it's in the Pension Code, and we respectfully submit that that was never what was intended by the drafters of the Pension Clause or the voters who ratified it. Before I get to the substance of the argument, I'd like to make two clarifications, if I may. First, the act that's challenged here did not undo any pension awards that had already been granted before the act took effect. Those were left in place. Nor did it prevent anybody who was already on a leave of absence from continuing on that leave of absence and earning service credits while working for a union, earning service credits in the public pension system. So those already commenced leaves of absence could continue. But it said, no future leave of absence may be used to earn service credit in the public pension system. That's the nub of this case. Now, we're not saying that the legislature may not provide as a statutory matter the right to earn service credits in a public pension system for working for a private union. We're just saying that's not within the protection of the Pension Protection Clause. And most people would be surprised when they hear that people are earning pension credit in a public pension system for working for a private employer. That reaction isn't legally controlling, but it's highly relevant to what was understood by the voters when they ratified this provision of the 1970 Constitution. And that understanding is consistent with past public service. It's a form of deferred compensation for public service to encourage continued public service. The Court's precedent on that before 1970 couldn't be clearer. And, in fact, Delegate Green at the convention, after Delegate Kinney had said, if we don't have this protection, people are going to leave public employment, he said that the lack of a contractual protection for these public pension systems was defeating the very purpose for which they were established, which was to encourage public service. But if you provide service credits in a public pension system for people that don't provide government work, you're encouraging exactly the opposite. The plaintiffs, accordingly, don't even really make any meaningful efforts to argue that it was ever intended that the Pension Clause of the Illinois Constitution was intended to protect service credits for work for a private employer. I could go into the language of the clause, how it refers to public employees, public pension systems, the constitutional protection or the contractual protection that it's intended to public employees. The real issue here, which this Court has to grapple with, is whether by putting something into the pension code, that necessarily converts it to something that's protected by the Pension Protection Clause. And we respectfully, again, submit that that was never what was intended by the voters, and it was never intended by the delegates at the Constitutional Convention. And those are the two things that this Court's landmark decision in Koneva established are the touchstones for determining the meaning of a constitutional provision. The common understanding of the people who, of the language of the people who voted for it and the problem that the delegates were intending to address in light of the history behind it. All of those factors line up to support the position that this unique constitutional provision does not reach private employment. Thank you very much. Thank you. May it please the Court, Counsel, my name is George Luscombe, representing the plaintiff retirement system participants and their unions. This case addresses three general categories of issues, and I'll try to address each of them in turn. Turning first to the State's appeal, plaintiffs respectfully request this Court to affirm the Circuit Court and hold that the Public Act 97-651 amendments eliminating the right to earn pension service credit for future leaves of absence beginning after the effective date of the Act violate the Pension Clause. The State effectively admits that it is asking this Court for the first time to create an unwritten limitation on the protections of the Constitution's Pension Clause, and that is something that this Court has held in Koneva and Heaton that it cannot do. As the Court held in Koneva and reiterated in Heaton, the Pension Clause means precisely what it says. If something qualifies as a benefit of the enforceable contractual relationship resulting from membership in one of the State's pension or retirement systems, it cannot be diminished or impaired. And this union leave of absence pension benefit falls squarely within that protection. It was created by the General Assembly in the Pension Code, and an individual's entitlement to it flows solely from their membership in the retirement system. As the Court held in Koneva, that is the end of the inquiry. Moreover, this Court's Fidel decision made clear that an option to contribute to a national service credit vests and cannot be diminished and impaired even before the participant exercises the option to contribute for that credit. And indeed, the union service credit here, just like the military service credit at issue in Fidel, was granted by the General Assembly as consideration for the participant's public employment. Just like every other of the retirement system benefits in the Code, the Circuit Court recognized all of this well, and nothing more is needed to affirm its holding. Counsel, with the provision that's in question here, eliminating the credit for time spent for leave working for the union, the constitutional authority apply only to public employees hired after the effective date of the statute? Justice, we don't have any claims for participants who are hired after the effective date of the statute, and I think consistent with this Court's precedent, the General Assembly is allowed to make new terms for the pension system for new entrants. That's correct. Thank you. The State offers only a very debatable policy argument in support of its argument that this Court should redo its plain reading of the pension clause. And while I understand that there are people who would disagree with the policy behind the union service credit, it is not the role of this Court to read unwritten limitations into a constitutional provision based on that policy argument. So the State dresses its argument up as an argument about the intent of the drafters or voters, but it has absolutely no evidence of that intent. It is not supported by the text of the Constitution, which refers only to the benefits of a retirement system as being protected without limitation, and it is not shown in the constitutional debates, which focus only on different issues. And it has already been pension clause are limited by some notion of what was a traditional pension benefit. Indeed, it is the State's argument that would undermine the purpose of the pension clause as recognized by this Court. The intent of the pension clause was that the General Assembly had to keep its promises when it granted a benefit as part of a retirement system, and that intent applies here. The State's argument, by contrast, would make it entirely illusory. The Circuit Court's decision should be affirmed on this issue. Turning to the issues presented by plaintiff's appeal, this Court should reverse the Circuit Court's dismissal of plaintiff's constitutional challenges to the Public Act 97651, Reduction in Plaintiff's Pensionable Salary Base. The Court's holding was General Assembly's that enacted the union service credit benefit in the first place, and it causes substantial harm to participants such as Plaintiff Davis, who in her 80s would be left with a pension of only about $1,300 per month based on her Board of Education salaries she last earned in 1991, despite her 18 years of contributions based on her union salaries before her 2011 retirement. Contrary to the plaintiff's appeal, the Act clearly reduced the pensionable salary base that laborers' fund and municipal fund members were entitled to use to calculate their pensions before the Act. For 20 years before the Act, the laborers' fund and municipal fund uniformly determined that participants' pensions could be based on labor organization salaries consistent with Articles 8 and 11 of the pension code before the Act. It was also fully consistent with the universal rule in the pension code in pension systems in Illinois, as well as pension law generally, that the salary base for pension purposes and the salary base upon which contributions were made should be the same. What about the union service credit benefits? The union service credit benefits should be the same as the union service credit benefits,  should be the same as the union service credit benefits. What about the fact that the legislature declared this provision to be a clarification? Yes, Your Honor. So I think the cases we cite in the briefs, including Okasik, make clear that while later legislature can say that their intent is to declare the meaning of preexisting law, that doesn't mean that that's so. It's up for the court to interpret the statute. So the question is, what was the intent of the language that existed before the Act? The declaration of existing law language in 2012, frankly, was the 2012 legislature recognizing that what they were trying to do was constitutionally circumspect and trying to find a way to circumvent the pension clauses protections. Is there any problem with separation of powers if we take your, if we buy your analysis? No, Your Honor. I think it's the exact opposite. It is, in fact, the courts that have the authority to interpret the law, the statutes that were enacted by a prior General Assembly. It is not the legislature's authority to interpret what a prior legislature enacted. In fact, in Okasik, the court spells out the sort of, in some ways, illogical idea that later legislators somehow noticed that there was a preexisting law and they didn't know what was in the mind of legislators who acted 20, 30 years before. So as noted, the General Assembly in 2012 passed the law in response to negative press articles about public employee pensions generally and about limited abuses by certain individuals, not plaintiffs in this case, taking advantage of the union service credit provisions. And they did it with the express intent to reduce the pensionable salary base of these participants. But since at least felt the Board of Trustees of the judge's retirement system, it was obvious that a reduction in a pensionable salary base violated the pension clause. So as noted, the General Assembly passed this declaration of existing law language in order to try again to circumvent the protections of the pension clause. And the state's argument to this, the state argues that the salary provisions adopted decades before the union service credit provisions always limited a salary to one paid by a public employer. And so for decades, the state says, the municipal fund and the laborers fund and their professional fiduciaries, including those appointed by the public employers that actually negotiated the legislation that created the union service credit benefit, simply were interpreting the law that they enacted, that they negotiated long ago wrong for 20 years. But neither the text or purpose of those salary provisions supports the state's argument. As detailed in the briefing, nothing in those salary provisions says that a salary only includes a salary paid by a public employer. If that were the legislature's intent, it could have easily said so. That would have been a good thing to have enacted, but it didn't. And the fact that never before the act did the legislation say a salary was limited to a salary paid by a public employer is evidence that that simply was not the intent of those provisions. And this court repeatedly says you must interpret the language of a statute in accord with its obvious intent. And here the obvious intent of those provisions was to define the amount of the annual salary by, for example, excluding types of compensation that one would otherwise think of as part of a salary, such as overtime. And second, by giving rules for converting things like an hourly wage to an annual salary by multiplying it by 2080. There is no reason to think that the General Assembly in 1963 or before had any actual intent to limit the salary to one paid by a public employer and to exclude a salary paid by a labor organization when the participant is actually paying on that labor organization salary. By contrast, there is every reason to think that the legislatures that actually enacted the union service credit intended that participants who took leave of absence and contributed to those pensions based on their union salaries could also have their pensions based on those same salaries. Indeed, if it was the legislature's intent to say that the pensionable salary base should be different from the contribution salary base, it surely would have done so in more expressed language. It would have been creating a unique anomaly in the whole of the pension code where the pension salary base and the contribution salary base were different. If that was their intent, they would have obviously done so. And the legislative history of those provisions further supports that intent. That history shows that the union service credit provisions were the legislature enacting a negotiated agreement between the city and the unions. And then for 20 years, as noted, the fund boards, including the public employer appointed trustees of those boards, the public employer appointed trustees of those boards, granted pensions based on union salaries for 20 years. Is that the statute to find an employer as the public body? Yes, Your Honor. How does that fit in with this whole analysis? So the employer is defined as the public body, and the state argues that the employee definition refers to an employee of an employer. And as we point out in the briefs, the employees on a union leave of absence remain at all times on a union leave of absence. They remain at all times employees of their public employers. And so while they are on a leave of absence, the salary of an employee is the salary that they're actually earning. And if it's in the last 10 years of service, and they've been contributing based on that union salary for a union service credit, that is permissibly used in the highest average annual salary calculation. As it was noting, it's inconceivable to think that the city trustees, if they're on a union leave of absence, are actually contributing based on union salaries. It was inconsistent with the legislation they negotiated, the intent of that legislation to have pensions based on union salaries. It's inconceivable that for 20 years, they would have allowed that to continue happening. That decades-long contemporaneous application of the legislation confirms that it was the intent of the union service credit provisions to allow pensions based on the salaries that the members were contributing based on. By contrast, the state cannot offer any evidence at all that the legislation would allow that. The legislature's intended that the contributions should be based on the union salary, but the pensions should be based on some city salary that the employee never actually earned, and that is even just hypothetical. They never made contributions on it, never earned, and we don't even know if their position in the service, for example, still existed during the leave of absence. But to the extent that any ambiguity is created by the salary definitions, that ambiguity also must be addressed. It must be interpreted in favor of the participant. As discussed, there is an obvious conflict between the state's clarification argument and this Court's well-established liberal construction rule. Ambiguity does not create the window for a later legislative amendment to clarify a provision against the rights of the participant. Ambiguity creates the obligation to interpret the provision in favor of the rights of the participant. If the state were to explicitly clarify an ambiguous provision of the pension code against the rights of the participant, the protections of the pension clause would be significantly undermined. Moreover, the purpose of the liberal construction rule is well served here. It is entirely unreasonable to think that the retirement system participants here, library aides, school counselors, electrical linemen, would have scoured the pension code to look for some reason why the pension board trustees were wrong. And how they had been interpreting the pension code for years, as the state's lawyers have here to try and defend the 2012 legislative action. To after the fact reject the board's reasonable interpretation for a more restrictive interpretation would have devastating consequences for these participants, leaving them with pensions of poverty level, near poverty level pensions in their 80s, when it is much too late for them to find other ways to save for retirement. I'll turn now to the last category of issues at issue in the case, which is the application of the Section 82263 proviso. We ask this court to reverse the circuit court's judgment and hold that the municipal fund Section 226C3 proviso does not apply to defined contribution plans, such as 401k plans. The circuit court's decision below is inconsistent with the ordinary and popular meaning of the statutory text, which the lay retirement system participant would reasonably understand as only restricting credit on receiving credit in a pension plan, a defined benefit pension plan. The circuit court's interpretation is also inconsistent with the liberal construction rule, and it too would cause substantial harm to these retirement system participants, wiping out all of their union service credit, leaving them with pensions in the neighborhood of $1,000 a month. It should not be forgotten that the municipal fund fiduciaries never gave participants any guidance on the meaning of this restriction, and therefore they should not be penalized retroactively for their reliance on a reasonable interpretation of that statutory language. Your Honor, this is the argument that applies to the Section 82263 restriction on being able to earn union service credit if a participant receives credit in a pension plan established by a local labor organization. And our argument is that that restriction, a restriction on receiving credit in a defined benefit, in a restriction in a pension plan, would be reasonably understood. The ordinary and popularly understood meaning of such a restriction would be to apply only to a defined benefit pension plan. Just think about what the ordinary person in the street would think if you asked them, do you receive credit in a pension plan for your work? If they had a defined benefit pension, they would, of course, say yes. But if you asked the person that question, and they did not have a defined benefit plan, but they only had a defined contribution plan, like a 401K plan, does anyone think that that person would say, yes, I have a pension? No. They would say, no, I don't have a pension. I have a retirement savings account that my employer may contribute to, but I do not have a pension. And the dictionary definitions we discuss in our briefs support that ordinary and popularly understood meaning of the term. Those dictionary definitions focus on a pension being a retirement benefit paid regularly with the amount of such benefit generally determined by the length of employment and amount of wages or salary of the pensioner. None of that is consistent with a defined contribution plan. And to be sure, an expert ERISA practitioner would point out that the federal ERISA statute includes defined contribution plans within its definition, its expansive definition of pension plan. But that ERISA definition does not apply here to a governmental pension plan, and there's no reason to think that the General Assembly in 1987 intended to import that definition into the pension code for a section that has entirely different purposes than the purposes of ERISA. And so that ambiguity too must be interpreted in favor of the participants who reasonably relied on the ordinary and popularly understood meaning of the term. And again, as noted, the municipal fund, their professional trustees and legal advisors never gave participants any guidance on the meaning of that restriction. So they didn't get summary plan description, any kind of detail answering that. For 20 years, all participants had to, more than 20 years, all the participants had to go on was the text of the statute. And even after the participants expressly asked the municipal fund trustees for the question of whether it applied to defined contribution plans, the municipal fund never responded until this case. I see my time is up. We ask the court to affirm the circuit court on counts 1A, 2A, and 3A, and reverse the circuit court on the other counts that we appeal. Thank you. Again, may it please the court, Assistant Attorney General Richard Huzzack. I just want to clarify. Mr. Huzzack, before you go any further, you heard my question to opposing counsel about the statute defining an employer as the public body. And he said the important thing there is that they always remain the employer regardless of the salary. And that's what the statute defines. And they're the employee. How do you address that? I think they've taken that language entirely out of context. And it fits within a context of several statutory definitions that together provide a very careful definition of what an employee's pensionable salary is. We don't dispute that these people are still technically employees. But that is how, it's important, isn't it? Because that's how the circuit court got to the finding salary didn't include union salary, right? Yes. And that is an element of the definition. But employee for that purpose defined in Section 8-113. And I'm just going to stick to the Article 8 definition so that we don't have to go back and forth between the identical provisions in Article 11. It defines an employee as any employee of an employer for these purposes. And there's a separate provision that allows leave of absence service credit if you work for a union that in the context of that provision provides that statutory right. But as part of the definition of a person's final average salary for determining their pension, and that language is used specifically for calculating pensions, that language refers to the actual sum payable if the employee worked the full normal working time in his position at the rate of compensation appropriate or to fix for working the normal working time. There's a similar definition, similar definitions for annual appropriated amounts or amounts fixed by appropriation or otherwise for non-annual compensation in Section 8-233. But then when we're talking about if the person did the work in the position as an employee, that refers to the situation if they were still working for the government. And there the definition of an employee in Section 8-233 defines an employee as any employee of an employer and Section 8-10 defines an employer as a government entity. So the careful statutory definition that Judge Mikva, now Justice Mikva, walked through when she reached the conclusion as to what the statutory definition was follows step by step. It provides a pensionable salary based upon the high risk average annual salary. It defines salary and annual salary very carefully based upon the position of an employee with an employer. And then it defines an employer for these purposes as being the employer or the employee of a government entity. That doesn't depart from the ability to earn service credit for working for a union as a statutory matter. But for the pensionable salary calculation, the definitions are carefully constructed and clear. The plaintiffs' would like the court to disregard this explicit careful statutory definition of a pensionable salary based upon so-called universal rules. But there's no law of nature that requires that the pensionable salary for somebody who's not working for the government be their actual salary working for a union. For four years, that was not the case. During the first four years in which the statutory ability existed, the statute referred to the last salary of the person before the person went on a leave of absence. So their own argument collapses by the original creation of the ability to go and work for a union in the first place. And what they'd like the court to say is, we should implicitly come up with some common-sense definition of a pensionable salary. And that's this notion that there should never be a discrepancy between the salary on which contributions are made and the salary on which a pension is calculated. If there were nothing in the pension code defining a pensionable salary, that might be an interesting default rule. But again, there's no law of nature that prohibits this discrepancy. And remember that when this privilege was granted, it was done allowing people to get service credit in a public workplace without providing any government work. So if their contributions went up above the level of their pensionable salary, that was a choice they had to make whether they wanted to do that or not. But you can't now go back and say, well, that seems like it shouldn't have been done that way. And we can then impute to the legislature an intention to have created a pensionable salary definition different from the one that explicitly adopted. And that's not the case. That's not the case. I do want to address the significance of the legislature's declaration that this was existing law. And the answer to that, the significance of that is both no, it's not dispositive, but yes, it's very relevant. And it is under separation of powers. It's absolutely this court's responsibility to determine what the legislature meant when it enacted that definition originally. The legislature cannot order this court to adopt some interpretation of a statute. But many times the legislature has clarified the meaning of a statute after a controversy has arisen. And if the statute is unambiguous, the court has given great weight to that. In this case, we argue that the statute is unambiguous because it explicitly provides what the definition of a pensionable salary is. But I do want to add the following caveat on the argument that the plaintiffs have argued, which is that even if this language always meant what the legislature now says it always meant, that the court can essentially give that meaning only prospective application. That doesn't make any sense. That is a separation of powers problem. If that clarification conforms to what the statute always meant and that clarification is constitutionally valid, then the legislature's declaration that it declares existing law is an express declaration as to its temporal effect. And if that declaration isn't unconstitutional, it's not within the court's residual common law or inherent authority to disregard that explicit declaration of its temporal effect. It's constitutional and it's clear as to what it was intended to apply to. Specifically on the last cross-appeal issue, the whole DCP issue? That's Mr. Pennelly's issue. We have not addressed that below or in this court in our briefs. And I prefer not to address it now. Okay. All right. But I see that they've, for purposes of oral argument, they've rested on their briefs with respect to the estoppel and the breach of contract claims. Unless the court has any questions, we would likewise rely on our briefs. There is absolutely no authority by these funds to violate public policy by promising people to enter into contracts or commit to make awards contrary to what the pensionable obligation code specifically allowed for this purpose. Again, remember that what's going on is that people are being given the ability, we would say a statutory right, not a constitutionally protected one, to get service credit in a pension plan for public employees without providing government work. They're complaining about the hardships of a change in their understanding. And we don't diminish the significance of those hardships. Those are unfortunate. But you can't have government policy determined by people that make erroneous interpretations of a statute so that when the legislature declares something to be the law, a government official who doesn't have authority to change the law can effectively change it for people by giving a misinterpretation of it. And in this case, they don't even say that anybody made an offer to enter into a contract, enter into an award that was inconsistent with the terms of the pension code, or made a representation to them specifically, somebody who was authorized to do so, to make such an agreement. That's where the Matthews case and the Patrick Engineering cases both come into play. I would like to add as well that although there is some hardship from complying with the law as it was always unambiguously specified, that is not the entire picture here. The example is given of Ms. Davis, who is now 80 years old. She was in the union for many years receiving a salary much higher than her government salary. And then when there was a change in union leadership, instead of going back to work for the government, she retired. Now, many people, they retire from their union jobs and collect a public pension for many years of union employment. And then also continue to work for the union, which is the classic sort of, wait a minute, you can't retire and go back to work for the employer and continue to earn a salary. That's sort of the double dipping problem here. So she retired instead of going back to work for a government job. And during the four years when she was retired, she received the pension payments in excess of $200,000, which were vastly greater than what the pension code authorized based upon the union salary for the position that she was no longer in. Again, the plaintiffs are off on this red herring about the statute doesn't specify who has to pay the salary. That's not what it ever refers to. It says what is the salary payable for the position? It never turns upon who pays it. So then when there's another change in union leadership, she goes back to work for the union again. And this is a situation where she retains her union job. And she retains the status of a public employee only if she doesn't actually have to do any public work. This is why the public is somewhat upset about the concept of these pension benefits for non-government employment. Again, the legislature in its wisdom or otherwise can statutorily grant these. But when there's a mistake in their interpretation that has gone on long standing, and the legislature correctly clarifies what the meaning of this was, the hardship has to be taken into consideration with these other factors. Now, I know that the parties have stipulated as well that if Ms. Davis' many contributions to the pension system or the pension contributions of anybody else were erroneous in excess of what was actually owed, then the parties have saved for another day those individuals' ability to seek restitution of those erroneous payments to the system, plus potentially unpaid contributions. So I want the court, instead of focusing only on the potential hardship issue, which is never the basis for determining what a statute means, but nonetheless to realize that there's another part of the picture here. The court should be looking at the one side of the ledger. Returning to the first issue in our appeal, the plaintiffs have said that the plain meaning of the pension clause clearly covers any benefit that's attendant to membership in a public pension system. And if we were talking about a traditional benefit that had been recognized in pension systems for many years, that would be one thing. That would be the elephant in the room situation. But here we have exactly the opposite. We have something that nobody ever contemplated, that's inconsistent with the historic purpose of public pensions, that in fact defeats that very purpose which was referred to by the Constitution delegates on the floor when they were proposing this provision. There's reference to the Kennerba case. And what I want to mention is that the Kennerba case, as significant as it is generally with respect to the pension clause and to the benefits that are protected by that, specifically referred to those convention delegate comments and also said in the beginning of its discussion in the background, in addition to the wages they are paid, most public employees in Illinois receive additional benefits, including subsidized health care. It was implicit in that decision that what they were talking about was the benefits attendant to membership in a public pension system for public employment. That's the same reference that was implicit in the Kennerba case. It couldn't be clearer at the 1970 Constitutional Convention. It's consistent with what this Court said in the Peters case about protecting the interests of public employees for continued public employment. It's the same interest that was clear in the Vidal case. The notion that unbeknownst to anybody and unanticipated by anybody, there was some expectation that this type of benefit would be protected by the pension clause converts the pension code into some type of a benefit that would be protected by the pension clause. It's like a Velcro Christmas tree where anything that gets put into it now becomes permanently protected against any adverse change for anybody who was a member of the system at the time. I think the core teaching of Kennerba is the touchstone for the Court's analysis here, which is that the Court has to focus on what was the common understanding of the voters when they approved this based on the language that was adopted and what was the historical background. All of those lead to the same conclusion, that it was never intended to be a benefit to the public. It was never intended that the constitutional protection for benefits in a public pension system should include benefits for private employment. Thank you so much, Your Honors. Thank you. May it please the Court, Vincent Pennelly on behalf of the Applee Municipal Employees Annuity and Benefit Fund of Chicago in Case No. 122822. The issue that I'm addressing this morning is an issue that has been raised by the plaintiff's counsel at his last point as to whether or not... You're the guy I'm looking for. I'm ready to answer now? I think I heard from opposing counsel both a legal argument based on an ambiguity with respect to the matter in Section 5 and also the unfairness of cutting the rug of a pension out from people who didn't understand that they were contributing to a DCAP without any idea that they would lose their public pension if they did so. So if you can address those two arguments. Certainly, Judge. First of all, with respect to... I'd like to just focus on the fact that nobody disputes that this is a provision was intended by the legislature to avoid or prohibit participating in two different pension plans. One for the private sector job as well as from the public sector job. So this language was specifically intended to limit the ability to do that and to prohibit double pensions. Also, it's important to note that the language itself that's at issue in these two claims was not amended at the time Public Act 95-651 was passed. This language has been there since the beginning in 1987 when it was passed. So as a backdrop, my point is simply that the language of the statute is clear on its face and the circuit court found that it's not ambiguous because any means of protection against any kind of pension. Any means any. And I think we can all accept the fact that the use of the term any pension plan is an expansive modifier, any. It's not a restrictive modifier such as the plaintiffs would want you to interpret it to be. But it doesn't fall under the common dictionary understanding of pension, does it? A fixed payment based on years of service credit? That's one definition. There's also other definitions as we point out. It's not guaranteed like a pension. It's a credit to an account. I think we cited that as another definition. So a credit in an account which is exactly what a defined contribution plan can be. You put money in, you get credit in your account. But isn't a DCP based on the employee taking less salary and is investing his own money into the plan? And the employer may or may not contribute depending on the plan? That is true, Judge. They come in all different sizes and shapes as the circuit court pointed out, defined contribution plans. So it's dependent on the performance of financial markets primarily? Well, it could be, yes. Although that's what the definition says, you have contributions coming in from the employee. You may have contributions coming in from the employer as well. A typical 401k plan might have a match provision where the employer is also contributing as well. So the basis of their argument that this is ambiguous relies on two things. One, it ignores the language of any pension plan. And two, it says that the use of the term credit in the provision means credit for service. But that's not what the legislature said. The legislature could have easily distinguished this language by saying taking out any and just defining it and saying defined benefit plans, defined contribution plans, whatever. It also could have inserted the word service in front of credit to make clear that it was referring to a defined benefit plan. But it didn't do that. It left it in the form it's in. The term credit is not defined in this section or in any other section of the pension code. The pension code is generally all about public pensions in Illinois. I mean, it doesn't use the erissant definition of pensions. I'm just saying does all this create an ambiguity in the legislature? Well, I understand your point, Judge. And my response would be simply that when the legislature provided this benefit to allow union members to take a leave, I'm sure they were aware that the pension plans they would be participating in would most likely be plans governed by ERISA. I mean, they're not public pension plans. They're private pension plans. So in fact, the two plans at issue that are the underpinnings of the declaratory judgment actions are both ERISA plans, both define themselves as pension plans in both their statements and their planning documents. So the bottom line is the statute doesn't define the term any pension, right, any pension plan. The dictionary definition seems to indicate a guaranteed fixed payment upon retirement is necessary to call something a pension. And the statutory definition is a pension. And the only definition of pension broad enough to encompass a DCP is found in ERISA. And we have to think that the legislature, in an act that talks primarily about government pensions, is employing an ERISA definition. And there's no ambiguity there at all. Judge, I think that I understand your points. Again, I don't know that you have to go to the statutory definition of pension. I think that the statutory interpretation principles to get there, to look outside the plain language, any means any, any pension plan, I think that's pretty clear. And again, credit can be credit in an account for monetary purposes. It doesn't necessarily have to be service credit. So I think the flip side of that is it's not ambiguous on its face. And if it's not, then you don't look at the dictionary definitions nor ERISA or anything else. And as well, the plan documents at issue in this case. So I think that's pretty clear. And again, credit can be credit in an account for monetary purposes. And as well, the plan documents at issue in this case. We're all defined contribution plans. I see my time is up. Do you have any other questions? Thank you. Your Honors, again, George Lescombe representing the plaintiffs, the retirement system participants and unions. I'll address first just briefly the defined contribution plan issue again. I think Your Honor hit the nail on the head, but the point is, and we've cases say, if there are competing definitions out there, that means it's ambiguous. When you then attach that to the liberal construction rule for a pension statute, that means it must be interpreted in favor of the participants. And here, especially when you look at the dictionaries from the time in 1987 when this was actually enacted, it absolutely was the most popular and the ordinary and popular understood meaning of a pension plan that it was a defined benefit pension plan, not a defined contribution plan. And that there's no language in the proviso that says anything different. The counsel focuses on the term any, but it's any pension plan. And if a pension plan is a defined benefit pension plan, well, it's any defined benefit pension plan, not defined contribution plan. And on the issue of credit, well, it's received credit in a pension plan. If a pension plan is a defined benefit pension plan, then that's that. And further, when you think about the purposes of it, it's to compare credit in a pension plan versus credit in a municipal fund plan. Well, credit in a municipal fund plan really in this counsel, it's for periods of service. So a defined benefit pension plan with periods of service. And just furthering showing the ambiguity is the fact that, again, when participants asked the municipal fund board for an opinion as to whether it covers, they couldn't give an answer for more than four years until they're briefed in this case. So turning then, I'll focus then primarily on the salary issue. Again, the counsel says, the assistant attorney general says that hardship should never be considered in interpreting the statute. Well, I think that's not quite right. Here we're interpreting pension statutes, which have the liberal construction rule, which I think comes from the purpose of when participants rely on a reasonable interpretation of the statutes, then to after the fact say, well, maybe we would have interpreted it differently, but we understand how that was reasonable. Well, the reason you don't allow that to be applied is because that would upset their expectations and there's nothing they can do about it after the fact. And then this is their pension that we're talking about. And then when you look at the text of the salary provisions that counsel relies on, I realize he was just paraphrasing the text, but he said something to the effect of, well, it's an employee and the salary then refers to the salary of the employee in his position with the employer. But no, none of the provisions actually say that. No provision says the employee of the salary in his position with the employer. It just says salary in his position. That salary can be well understood as the position, the position could be well understood as the position he's actually working in, earning a salary, and contributing to the fund. When that section is read in context, what it's saying is the amount payable in the position, if you work the full time in that salary, exclusive of overtime and final vacation payout. What that provision is saying is, well, if you work full time in the position but earned overtime, we're not going to include the overtime. We're just going to include the full time in the position. That is the same as can be used for a union salary. And he focuses on language such as appropriation. We cite definitions in our brief that say appropriate is not limited to a public employer. And it also uses other phrases such as fixed. And it uses the term fixed or appropriated. Well, that's disjunctive. It can be fixed or appropriated. It's not a fixed salary. And by his limited definition, as we point out in our brief, it would also exclude salaries paid by the Chicago Board of Education, which doesn't list salaries in an annual appropriation ordinance. So if that literal interpretation that he's relying on was meant to say no salary can be counted unless it follows their framework, well then, the Board of Education salaries couldn't be included in a salary either. And that's simply just an absurd result. While those provisions about salary are detailed and careful, as counsel points out, they're detailed and careful about considering the amounts that you count, how you multiply hourly wage to get to a salary, for example. I see my time is up unless the court has any questions. Thank you for your time. Thank you. Thank you. Case numbers 122793 and 122822, Carmichael and others versus laborers and retirement board employees. We'll be taken under advisement as agenda number 14. Mr. Hussack, Mr. Luscombe, and Mr. Pinelli, we thank you for all of your arguments today and keeping track of who had to get up when. Thank you. You're excused.